## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

**ROSE MARIE GARCÍA-DÍAZ, et al.,**

**Plaintiffs,**

**v.**                                                    CIVIL NO. 14-1354 (GAG)

**HON. EDUARDO CINTRÓN-SUÁREZ, et al.,**

**Defendants.**

### OPINION AND ORDER

Plaintiffs Yashira García-Velázquez ("García-Velázquez") and Rose Marie García-Díaz ("García-Díaz") (collectively, "Plaintiffs") bring this action, through 42 U.S.C. § 1983, alleging political discrimination and property deprivation without due process of law, in violation of Plaintiffs' First and Fourteenth Amendment rights, against the Municipality of Guayama ("the Municipality"), its Mayor, Eduardo Cintrón-Suárez ("Cintrón-Suárez"), and the Municipality's Police Commissioner, Daniel Colón-Díaz ("Colón-Díaz") (collectively, "Defendants").  Plaintiffs claim Defendants dismissed them from their appointments as Municipal police cadets because of their political affiliation.  Plaintiffs also invoke the Court's supplemental jurisdiction, alleging related state law claims.  Id. at 15-16.  Plaintiffs seek compensatory and punitive damages, injunctive relief reinstating Plaintiffs to their positions as police cadets, and attorneys' fees and expenses under 42 U.S.C. § 1988.  Id. at 16-17.

Presently before the Court is Defendants' motion for summary judgment.  (Docket No. 69.) Defendants generally argue Plaintiffs were dismissed—not because of political affiliation—but because they did not complete the required police academy.  (Docket No. 70, at 2.)  Likewise, Defendants contend Plaintiffs lacked a property interest in their continued employment, since their

Civil No. 14-1354 (GAG)

cadet positions were probationary appointments.  Id. at 41-44.  Plaintiffs respond that Defendants'

discriminatory animus motivated the obstacles Plaintiffs encountered at the police academy, as well

as their resulting terminations from the Municipality, and that these acts constituted political

discrimination and property deprivation without due process.  (Docket No. 83.)  For the reasons set

forth below, Defendants' motion for summary judgment is **GRANTED.**

## I.   Relevant Factual and Procedural Background

Before assessing the facts of Plaintiffs' case, a brief primer in Puerto Rico politics is

necessary.  There are two major political parties in Puerto Rico: the Popular Democratic Party

("PDP") and the New Progressive Party ("NPP").  Local government control, at both the state and

municipal level, oscillates between these two parties.  Changes in political control tend to lead to

turnover in public employment positions.  All too often, "the political party assuming office

terminates the employment of public employees who are affiliated with the party going out of power

and then fills those vacancies with its own members."  Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d

121, 125 (1st Cir. 2004); see also Reyes-Perez v. State Ins. Fund Corp., 755 F.3d 49, 50 (1st Cir.

2014).  Regrettably, this type of political patronage can occur even where politics have nothing to

do with a particular job, for example, within the ranks of local police departments.  Plaintiffs claim

to have fallen victim to this trend.

The events of this case took place in the midst of the 2012 election season.  (Docket No. 1.)

Before the 2012 election, Glorimari Jaime-Rodriguez ("Jaime-Rodriguez") served as the Mayor of

the Municipality of Guayama.  (Docket Nos. 84 ¶ 3; 93-1 ¶ 3.)  Jaime-Rodriguez was affiliated with

the NPP.  (Docket Nos. 84 ¶ 7; 93-1 ¶ 7.)  Defendant Cintrón-Suárez, who is affiliated with the PDP,

beat Jaime-Rodriguez in the 2012 election and became Mayor-Elector of the Municipality in

November 2012.  (Docket No. 35, at 4.)  On February 1, 2013, after the election and inauguration,

Civil No. 14-1354 (GAG)

Cintrón-Suárez appointed Colón-Díaz, a PDP supporter, as Commissioner of the Municipal Police of Guayama.  (Docket No. 71-6, at 7-9.)

The Municipality and the Puerto Rico Police Department ("PRPD") have a contract to provide police training courses for municipal police officer candidates.  (Docket Nos. 71 ¶ 1; 84 ¶ 92.)  The Criminal Justice University College ("the Academy") operates as part of the PRPD.[1] (Docket Nos. 71 ¶ 2; 84 ¶ 92.)  On January 24, 2012, the Municipality entered into a contract with the Academy for cadet-training services.  The Municipality was responsible for screening candidates for the municipal police before sending them to the Academy for training.  (Docket Nos. 71 ¶ 3; 84 ¶ 92.)  Then, the Academy trained and certified the cadets to become municipal police officers after they completed the Academy.  (Docket Nos. 71 ¶ 88; 84 ¶ 92.)

The Academy was solely responsible for training, evaluating, and certifying the cadets. (Docket Nos. 71 ¶¶ 5, 12; 84 ¶ 92.)   Under the agreement, the Academy set the curriculum, determined minimum passing requirements, assigned grades, and assessed cadet progress in completing Academy courses.  (Docket Nos. 71 ¶¶ 6-12; 84 ¶ 92.)  If a cadet did not complete the Academy, the Academy had authority remove the cadet from the training program.[2]  (Docket No. 79-13, at 5.)  Neither the Municipality nor the Municipal Police Commissioner were involved with

---

[1] The Court takes judicial notice that, as of 2013, the Academy no longer functions as a college, but rather as an academy providing initial training for cadets and continued training for members of the police force.  This change is part of the Court-supervised police reform agreement entered into in 2013 between the PRPD and the United States Department of Justice.  See United States v. Puerto Rico, No. 12-2039 (GAG).

[2] Specifically, paragraph eleven of the contract between the Municipality and the Academy provided:

In the event that the [cadet] does not pass one or more courses for reasons attributable for academic performance or any non-compliance with the rules and/or regulations of [the Academy]; [the Academy] will proceed to expel that participant and [the Municipality] will have no right to claim any credit whatsoever for the cost of said course or courses.

(Docket No. 79-13, at 5.)

Civil No. 14-1354 (GAG)

1  these Academy functions.  (Docket Nos. 71 ¶ 11; 84 ¶ 92.)  Although the Municipal Commissioner

2  monitored cadet progress through the Academy, the Municipality was not involved in assigning

3  grades to cadets.  (Docket Nos. 71 ¶ 14, 19; 84 ¶ 92.)

4  Graduating the Academy is a requirement for becoming a member of the Municipal Police.

5  All cadets must have "passed a course designed in coordination between the [PRPD] and

6  administered by the [Academy]."  (Docket Nos. 84 ¶ 88; 93-1 ¶ 88.)  If a cadet fails a course once,

7  that course can be repeated a second time.  (Docket Nos. 84 ¶ 19; 93-1 ¶ 19.)  However, the Academy

8  does not permit cadets to take a course a third time.  (Docket Nos. 71 ¶ 30; 84 ¶ 92.)  Upon successful

9  completion of the required courses, the Academy submits an evaluation of the cadet's file to the

10  PRPD Superintendent for approval.  (Docket Nos. 71 ¶¶ 5, 12; 84 ¶ 92.)  At the relevant time, the

11  PRPD Superintendent was Hector Pesquera ("Pesquera").  (Docket Nos. 71 ¶ 77; 84 ¶ 92.)

12  Plaintiffs were appointed as police officer candidates before the 2012 election, by the Jaime-

13  Rodriguez administration.  (Docket Nos. 71 ¶ 87; 84 ¶ 92.)  Both Plaintiffs signed a contract to work

14  as a "Municipal Police Cadet" on March 13, 2012.  (Docket Nos. 71 ¶ 56, 86; 84 ¶ 92, see also

15  Docket Nos. 79-4, 79-24.)  The contract—entitled a "Notice of Appointment and Oath"—listed the

16  type of employment as "Probationary" with a "Transitory or temporary expiration date" of

17  December 31, 2012.  (Docket Nos. 79-4, 79-24.)  Both Plaintiffs knew they had to complete the

18  Academy's curriculum to become municipal police officers.  (Docket Nos. 71 ¶¶ 58, 85; 84 ¶ 92.)

19  While enrolled in the Academy as cadets, Plaintiffs were assigned to provide security at

20  Cintrón-Suárez's PDP campaign headquarters during the 2012 campaign season.  (Docket Nos. 84

21  ¶ 6; 93-1 ¶ 6.)  During the campaign season, phrases like "people of Glorimari" and "people of

22  Eduardo" were commonly used to identify PDP and NPP party allegiances within the Municipality.

23  (Docket Nos. 84 ¶ 7; 93-1 ¶ 7.)  Plaintiffs allege that, by working this detail assignment, Cintrón-

4

Civil No. 14-1354 (GAG)

Suárez learned of Plaintiffs' NPP party affiliation, referred to them as "people of Glorimari" and began to develop the intent to terminate Plaintiffs employment if elected Mayor of Guayama. (Docket Nos. 84 ¶¶ 8-10.)  Cintrón-Suárez denies knowing Plaintiffs or their party affiliation at that time.  (Docket Nos. 71 ¶ 135; 93-1 ¶ 8-10.)

Plaintiffs allege that Cintrón-Suárez threatened to terminate them from their employment positions.  (Docket No. 84 ¶ 17.)  On election day, Jamie-Rodriguez's campaign arranged for a helicopter to fly around the Municipality with a promotional banner.  Id.  When the helicopter passed PDP party headquarters, Cintrón-Suárez allegedly took exception to Jamie-Rodriguez's advertisement and directed his anger in Plaintiffs' direction, pointing and stating "look at the people they got here, they don't trust me, I cannot trust them and when I win they are going out."  Id.  In Plaintiffs' view, this statement meant Cintrón-Suárez planned to terminate Plaintiffs' employment.[3]

After the election, Plaintiffs remained enrolled as cadets in the Academy.  However, Plaintiffs did not pass all of the Academy's required courses.  (See, e.g., Docket No. 1 ¶ 23, 36.) According to her official academic transcript,[4] García-Díaz failed course CIPO 210 and withdrew from CIPO 212.  (Docket Nos. 71 ¶ 20; 84 ¶ 92; see also 79-1.)  García-Velázquez's official academic transcript shows she failed course CIPO 210 twice and withdrew from CIPO 209, CIPO 211 and CIPO 212.  (Docket Nos. 71 ¶ 32; 84 ¶ 96; see also Docket No. 79-2.)  On March 11, 2013, Plaintiffs were removed from the Academy.  (Docket No. 79-6.)  Then, on May 6, 2013, Cintrón-

---

[3] This statement, which relates to Cintrón-Suárez's motive, is a clearly defined hearsay exception.  FED. R. EVID. 803(3) (excepting from the rule against hearsay statements "of the declarant's then-existing state of mind (such as motive, intent, or plan) . . . .").  Plaintiffs also point to other statements made by Cintrón-Suárez and third parties to bolster their position.  (Docket No. 84 ¶¶ 10-12, 17-18, 40-44.)  However, these other statements are unrelated to motive, so they raise more pressing hearsay concerns.  See FED. R. EVID. 802.

[4] The Court relies only on the official versions of Plaintiffs academic transcripts, and not the unofficial (and unauthenticated) transcripts submitted by Plaintiffs.  See FED. R. EVID. 901.

Civil No. 14-1354 (GAG)

1   Suárez dismissed Plaintiffs from the Municipality because they had failed to "comply with the

2   necessary requirements of the Training Program" for police cadets.  (Docket No. 79-9.)

3         Plaintiffs' removal from the Academy and dismissal from the Municipality occurred amidst

4   a flurry of letters.  On March 11, 2013, the Academy Chancellor informed Colón-Díaz that both

5   Plaintiffs had failed to pass CIPO 210 for a second time.  (Docket No. 79-6.)  As a result, the

6   Academy Chancellor removed Plaintiffs from the Academy and referred Plaintiffs back to the

7   Municipality.  Id.  On March 14, 2013, Colón-Díaz wrote to the Associate Superintendent of the

8   PRPD and requested that Plaintiffs repeat CIPO 210 and CIPO 212.  (Docket No. 79-7.)  That same

9   day, García-Velázquez wrote to Cintrón-Suárez to request a second opportunity to take CIPO 210

10  and CIPO 212.  (Docket No. 79-14.)  On March 26, 2013, PRPD Superintendent Pesquera wrote to

11  Colón-Díaz denying Colón-Díaz's request and informing that Plaintiffs "were given a second chance

12  to take CIPO 210 Course, which they did not pass."  (Docket No. 79-26.)  On May 8, 2013, García-

13  Díaz wrote to Superintendent Pesquera and requested a "second opportunity" to complete the

14  required courses.  (Docket No. 79-10.)  On December 8, 2013, García-Díaz wrote to the Academy

15  Chancellor to request a retake of CIPO 212.  (Docket No. 79-23.)

16        Plaintiffs concede they did not complete the required Academy coursework.  (Docket No. 71

17  ¶ 137; see also Docket No. 84 ¶ 99) ("Cintrón-Suárez could have appointed the Plaintiffs if they had

18  been given a fair opportunity to repeat the pending courses and conclude the training.")  Instead,

19  Plaintiffs contend they never got the chance to take the required courses a second time.  If they had

20  been permitted to retake the required courses, Plaintiffs reason, then they would have passed,

21  graduated, and become Municipal Police Officers.

22        In the Academy, if a cadet fails a course once, that course can be repeated one more time.

23  (Docket Nos. 84 ¶ 19; 93-1 ¶¶ 19, 92.)  However, a cadet may not repeat that course a second time.

24

6

Civil No. 14-1354 (GAG)

(Docket Nos. 71 ¶ 30; 84 ¶¶ 19, 92.)  Plaintiffs claim it "is the norm at the Academy" for cadets to receive a second opportunity to retake a course.  (Docket No. 84 ¶ 98.)  The Mayor and the Municipal Commissioner "have no authority over the Academy" to require that cadets be permitted to retake a course.  (Docket Nos. 71 ¶ 43; 84 ¶ 100.)  Plaintiffs claim they did not receive a second opportunity to take each required class, that is, CIPO 210 and CIPO 212 for García-Díaz and CIPO 209, CIPO 210, CIPO 211, and CIPO 212 for García-Velázquez.  (Docket Nos. 71 ¶¶ 20, 32; 84 ¶¶ 92, 96.)

Plaintiffs also contend they were denied appointments as auxiliary police officers.  (Docket No. 83, at 16-17.)  As Mayor, Cintrón-Suárez has the discretion to make appointments to the Emergency Management Department, which includes a small auxiliary police force.  (Docket Nos. 84 ¶ 48; 93-1 ¶ 48.)  Even though Plaintiffs did not complete the Academy coursework, Colón-Díaz recommended that Cintrón-Suárez appoint Plaintiffs as members of the auxiliary police, for which completion of the Academy is not a prerequisite.  (Docket Nos. 84 ¶ 49; 93-1 ¶ 49; see also Docket No. 71-6, at 20.)  Cintrón-Suárez did not respond to Colón-Díaz's recommendation and did not appoint Plaintiffs to the auxiliary police.  (Docket Nos. 84 ¶¶ 50, 53; 93-1 ¶¶ 50, 53.)  Instead, Cintrón-Suárez appointed two other individuals as auxiliary police force, one of whom Cintrón-Suárez knew to be a PDP supporter.  (Docket Nos. 84 ¶¶ 56, 58; 93-1 ¶¶ 56, 58.)  In total, Cintrón-Suárez made fourteen appointments to the Emergency Management Department; seven appointees were PDP affiliates, while the affiliations of the other seven appointees were unknown to Cintrón-Suárez.  (Docket Nos. 84 ¶¶ 60, 61; 93-1 ¶¶ 60, 61.)

Plaintiffs filed their complaint in the above-captioned case on May 2, 2014.  (Docket No. 1.)  Subsequently, Defendants moved to dismiss Plaintiffs' claims.  (Docket Nos. 12, 19.)  On July 23, 2013, the Court issued an Opinion and Order resolving Defendants' motions to dismiss.  See García-Díaz v. Cintrón-Suárez, 120 F. Supp. 3d 68 (D.P.R. 2015).  The Court dismissed the official capacity

**Civil No. 14-1354 (GAG)**

and personal capacity First Amendment claims against Colón-Díaz because the complaint alleged no facts of Colón-Díaz's discriminatory animus towards Plaintiffs. Id. at 89. The Court denied the motion to dismiss as to Plaintiffs' other claims and denied without prejudice Defendants qualified immunity defense. Id. at 92-93. Following discovery, Defendants moved for summary judgment. (Docket No. 69.)

## II.   Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted). The movant bears the initial burden of demonstrating the lack of evidence to support the nonmovant's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to support the nonmoving party's case. The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).

The nonmovant may establish a fact is genuinely in dispute by citing evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the Court finds that a genuine factual issue remains, the resolution of which could affect the outcome of the case, then summary judgment must be denied. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Civil No. 14-1354 (GAG)

At summary judgment, the Court views the evidence in the light most favorable to the nonmovant and resolves all reasonable inferences in the nonmovant's favor. Id. at 255. The Court does not make credibility determinations or weigh the evidence. Id. However, summary judgment may be appropriate if the nonmovant's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayagüez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

### III.   Discussion

Plaintiffs bring this action, through 42 U.S.C. § 1983, alleging Defendants violated their federal rights in two ways. First, Plaintiffs claim Defendants discriminated against them, based on their opposing political affiliation, in violation of the First Amendment. Second, Plaintiffs claim Defendants deprived them of a property right without due process of law, in violation of the Fourteenth Amendment.

To establish section 1983 liability, plaintiffs must demonstrate by a preponderance of the evidence that: "(1) the challenged conduct was attributable to a person acting under color of state law; and (2) the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States." Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 151-52 (1st Cir. 2006) (citing Johnson v. Mahoney, 424 F.3d 83, 89 (1st Cir. 2005)). For the purposes of section 1983 liability, Puerto Rico is the functional equivalent of a state. Rojas-Velázquez v. Figueroa-Sancha, 676 F.3d 206, 209 (1st Cir. 2012) (citation omitted). Since Defendants clearly acted under color of Puerto Rico law, each claim turns on whether Defendants impermissibly deprived Plaintiffs of any federally protected right. The Court examines each theory of constitutional injury in turn.

9

Civil No. 14-1354 (GAG)

A. First Amendment Claims

Plaintiffs allege political discrimination in violation of their First Amendment rights by Defendants Cintrón-Suárez and the Municipality.[5]  (Docket No. 1, at 14.)  The First Amendment "protects 'non-policymaking' public employees from adverse employment actions based on their political affiliation or opinion."  Velez-Rivera, 437 F.3d at 152 (quoting González-Piña v. Rodríguez, 407 F.3d 425, 431 (1st Cir. 2005).  To establish a claim, plaintiff must first set forth a prima facie case of political discrimination.  Then, the burden shifts to defendant to show, by a preponderance of the evidence, a nondiscriminatory reason for the adverse employment action.  Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  A nondiscriminatory reason is one that would have resulted in the adverse action, regardless of plaintiff's political affiliation.  Id.  Plaintiff may discredit defendant's Mt. Healthy defense by showing pretext—that discrimination was more likely than not a motivating factor for the adverse employment action.  Padilla-Garcia v. Guillermo-Rodriguez, 212 F.3d 69, 77 (1st Cir. 2000).

1. Plaintiff's Prima Facie Case

To set forth a prima facie political discrimination case, Plaintiffs here must establish a reasonable inference that their terminations were substantially motivated by their political affiliation with the NPP.  See Welch v. Ciampa, 542 F.3d 927, 940 (1st Cir. 2008).  That showing breaks down into four components: (1) plaintiff and defendant had opposing political affiliations; (2) defendant was aware of plaintiff's affiliation; (3) plaintiff suffered an adverse employment action; and (4) that political affiliation was "a substantial or motivating factor for the adverse employment action."  Reyes-Orta v. P.R. Highway and Transp. Auth., 881 F.3d 67, 73 (1st Cir. 2016) (quoting Ocasio-

_____

[5] Plaintiffs' political discrimination claims against Defendant Colón-Díaz, in both his personal and official capacity, were dismissed at the motion to dismiss stage.  García-Díaz, 120 F. Supp. 3d at 92-93.

10

Civil No. 14-1354 (GAG)

1    Hernández v. Fortuño-Burset, 640 F.3d 1, 13 (1st Cir. 2011)).  Defendants contest each element of

2    the *prima facie* case,[6] but the crux of the dispute here is about the fourth element—causation.

3           The first element is clearly satisfied, since Plaintiffs and Cintrón-Suárez belong to opposing

4    political parties.  Plaintiffs belong to the NPP.  (Docket Nos. 84 ¶ 7; 93-1 ¶ 7.)  Cintrón-Suárez is a

5    PDP member.  (Docket No. 35, at 4.)

6           Second, Plaintiffs have established a reasonable inference that Cintrón-Suárez knew of

7    Plaintiffs' NPP affiliation.  Plaintiffs worked a detail assignment at Cintrón-Suárez's campaign

8    headquarters.  (Docket Nos. 84 ¶ 6; 93-1 ¶ 6.)  Plaintiffs performed this detail assignment in the

9    politically charged atmosphere that was the 2012 campaign season.  Additionally, Plaintiffs allege

10   Cintrón-Suárez referred to them as "Glorimari's kids" and/or "people of Glorimari" while on the

11   detail assignment.  (Docket No. 84 ¶¶ 8-10.)  On election day, Cintrón-Suarez pointed in Plaintiffs

12   direction and angrily claimed, "when I win they are going out." Id. at ¶ 17.  Cintrón-Suárez contests

13   these facts, thereby creating to a credibility contest.  Credibility determinations are the province of

14   the jury.  See Peguero-Moronta v. Santiago, 464 F.3d 29, 49 (1st Cir. 2006) (citation omitted).

15   Drawing all reasonable inferences in Plaintiffs' favor, a jury could reasonably infer that Cintrón-

16   Suárez knew of Plaintiffs' NPP party affiliation.  See Torres-Santiago v. Municipality of Adjuntas,

17   693 F.3d 230, 237 (1st Cir. 2012) (where political affiliations are common knowledge among

18   municipal employees, the court proceeds to the third prong of the *prima facie* analysis).

19          Third, a jury could reasonably infer that Plaintiffs' termination constituted an adverse

20   employment action.  Plaintiffs actually allege three adverse employment actions: (1) they were

21   denied an opportunity to retake the required Academy courses, (2) they were denied appointments

22

23          [6] In moving to dismiss, Defendants conceded the first three elements of the *prima facie* case.  (Compare
     Docket No. 12 at 8 with Docket No. 70 at 25-26.)

24                                                    11

Civil No. 14-1354 (GAG)

1   as auxiliary police officers, and (3) they were terminated from their positions as police cadets.

2   Putting the first two alleged adverse actions aside,[7] Plaintiffs termination is sufficient to satisfy the

3   adverse action element of their *prima facie* case.

4   Plaintiffs police cadet contracts stated a December 31, 2012 expiration date, but Plaintiffs

5   were not removed from the Municipal Police until May 6, 2013.  (Docket Nos. 79-4, 79-9, 79-24.)

6   Since Plaintiffs remained enrolled in the Academy after the contract's expiration date, a jury could

7   reasonably conclude that Cintrón-Suárez's May 6, 2013 termination letter constituted an adverse

8   employment action.  See Ramos v. Chiqués, No. 13-1903-GAG, 2016 WL 389985, at *3 (D.P.R.

9   February 1, 2016) (finding an adverse employment action where it was undisputed that plaintiffs

10   transitory, fixed-term employment contracts were cancelled).

11   Turning to the fourth element of the *prima facie* case, Plaintiffs must show that their NPP

12   affiliation was "a substantial factor in the adverse employment decision." Carrasquillo v. Puerto

13   Rico *ex rel.* Justice Dep't, 494 F.3d 1, 4 (1st Cir. 2007) (citing Mt. Healthy, 429 U.S. at 287).  "Even

14   when it is clear that the defendant has a political agenda or harbors political biases, it remains the

15   plaintiff's burden to produce evidence of a causal connection between those biases and the

16   challenged employment action." Mercado-Berrios v. Cancel-Alegría, 611 F.3d 18, 24 (1st Cir.

17   2010).  Plaintiffs may satisfy this burden through direct or circumstantial evidence.  Id.

18   On this critical issue, Plaintiffs' evidence is wafer-thin.  Plaintiffs essentially rely on Cintrón-

19   Suárez's comments during the election day helicopter incident to link Cintrón-Suárez's

20

21   _____

22   [7] The denial of the course retakes is not attributable to Defendants because the Academy made that decision.  The lack of an appointment to the auxiliary police was not adverse because there is no evidence Plaintiffs

23   actually applied for the position.  Since there is no evidence Plaintiffs applied, there is no evidence of a discriminatory hiring decision as to Plaintiffs.  See Rutan v. Republican Party of Ill., 497 U.S. 62, 78 (1990) (conditioning hiring decisions on political association generally violates the First Amendment).

24

**Civil No. 14-1354 (GAG)**

discriminatory animus to Plaintiffs' May 2013 removal.  (Docket No. 83, at 17-18.)  In political

discrimination cases, direct "smoking gun" evidence is rare.  Lamboy-Ortiz v. Ortiz-Velez, 630 F.3d

228, 240 (1st Cir. 2010) (quoting Anthony v. Sundlun, 952 F.2d 602, 605 (1st Cir. 1991)).  The

politically charged atmosphere, coupled with Cintrón-Suárez's statement, could lead a jury to infer

Cintrón-Suárez harbored the discriminatory intent to terminate Plaintiffs due to their NPP affiliation.

However, this connection is tenuous for three reasons.  First, there was a five-month gap

between Cintrón-Suárez's one-off statement and Plaintiffs' terminations.  See, e.g., Torres-Santiago,

693 F.3d at 240 (sufficient one month temporal proximity between an administration change and

adverse action).  Additionally, Colón-Díaz supported Plaintiffs' efforts in the Academy.  (Docket

Nos. 79-7, 79-8, 79-21.)  This further undermines the inference that Cintrón-Suárez truly sought

retribution against Plaintiffs.  Finally, and perhaps most importantly, the undisputed evidence shows

the Academy functioned as an independent decision-maker in assessing police cadet performance.

(Docket Nos. 71 ¶¶ 6-12; 84 ¶ 92; see also Docket No. 79-13, at 4, "[The Academy] will individually

evaluate the conduct, attendance and academic performance of each participant.")

Nevertheless, the Court will assume for the sake of argument a jury could credit Plaintiffs'

version of events, and thereby reasonably infer Plaintiffs' NPP affiliation was a substantial factor in

their removal from the Municipal Police.  See Vélez-Rivera, 437 F.3d at 152 (assuming the *prima*

*facie* case and affirming the district court's grant of summary judgment because plaintiff's lack of

qualifications justified dismissal under Mt. Healthy).

### 2. *Mt. Healthy* Defense

Assuming Plaintiffs established the political discrimination *prima facie* case, the burden

shifts to Defendants to show: (1) Defendants would have taken the same action regardless of political

affiliation and (2) such action is not otherwise unconstitutional.  Mt. Healthy, 429 U.S. at 274; Reyes-

Civil No. 14-1354 (GAG)

Orta, 811 F.3d at 73; Vélez-Rivera, 437 F.3d at 152.  Thus, "even if a plaintiff shows an impermissible political motive, he cannot win if the employer shows that it would have taken the same action" regardless of the political motive.  Soto-Padro v. Pub. Bldgs. Auth., 675 F.3d 1, 6 (1st Cir. 2012).  Defendant bears the burden of persuading the fact-finder that the non-discriminatory reason is credible.  Welch, 542 F.3d at 941 (citing Padilla-Garcia, 212 F.3d at 77-78).

Defendants maintain that political affiliation was not a factor in Plaintiffs' terminations; rather, Plaintiffs were terminated for failing to complete the required Academy coursework. Graduating from the Academy is required to become a Municipal police officer.  To graduate, a cadet must complete all required courses, as determined by the Academy.  (Docket Nos. 71 ¶ 7; 84 ¶ 92.)  If a cadet fails a course once, that course can be repeated once, but not twice.  (Docket Nos. 71 ¶ 30; 84 ¶ 19, 92; 93-1 ¶ 19.)  There is no evidence in the record to show that a cadet *must* be permitted to repeat a course.  Plaintiffs have not set forth evidence of other cadets who received multiple opportunities to retake Academy courses.  Importantly, the parties agree that the Mayor and the Municipal Commissioner "have no authority over the Academy" to require or request that cadets be allowed to retake a course.  (Docket No. 71 ¶ 43; 84 ¶ 100.)

Here, the record reveals a series of letters showing Plaintiffs were terminated for failure to complete the Academy.  First, the Academy Chancellor informed Colón-Díaz that both Plaintiffs had failed to pass CIPO 210 for a second time.  (Docket No. 79-6.)  Then, the PRPD Superintendent denied Colón-Díaz's request that Plaintiffs retake the necessary Academy courses.  (Docket No. 79-26.)  Finally, Cintrón-Suárez notified each Plaintiff of her dismissal for failure to complete the Academy.  (Docket No. 79-9.)  Plaintiffs were not singled out because of their political affiliation; they were singled out because they did not pass the required Academy courses.  Cf. Reyes-Orta, 811 F.3d at 77-78 (finding a genuine dispute about defendant's motive when plaintiff and many other

14

**Civil No. 14-1354 (GAG)**

PDP-affiliated career employees were targeted and subsequently terminated after an NPP-led internal investigation and audit).

Defendants have set forth sufficient evidence to show Plaintiffs would have been terminated as police cadets—regardless of their NPP affiliation—due to their failure to complete the Academy. Thus, Defendants have established a Mt. Healthy defense. See, e.g., Reyes-Perez, 755 F.3d at 54 (affirming summary judgment grant where a "comprehensive organizational restructuring" established a Mt. Healthy defense justifying plaintiff's demotion and subsequent termination).

3. Pretext

Plaintiffs contend the Mt. Healthy defense—that Plaintiffs were terminated for failure to complete the Academy—is a mere ruse. "In a political discrimination case, the plaintiff may discredit the proffered nondiscriminatory reason, either circumstantially or directly, by adducing evidence that discrimination was more likely than not a motivating factor." Padilla-Garcia, 212 F.3d at 77 (citations omitted). As stated before, it remains defendant's burden to persuade that that nondiscriminatory reason is credible. Id. at 77-78.

Plaintiffs attempt to discredit the Mt. Healthy defense in two ways. First, Plaintiffs claim they never received a second opportunity to take the required Academy courses because Defendants deliberately prevented them from doing so. (Docket No. 83 at 18.) Second, Plaintiffs argue that Cintrón-Suárez's discriminatory animus is evident because they were not appointed as auxiliary police after they failed to complete the Academy. Id. Both arguments miss the mark.

Plaintiffs contend Defendants schemed to prevent them from retaking the Academy courses they did not pass in their first attempt. The initial premise of this argument—that Plaintiffs did not retake the required courses—lacks evidentiary support, even construing the record in Plaintiffs' favor. Numerous documents reference Plaintiffs' second attempts to pass the required courses.

**Civil No. 14-1354 (GAG)**

(Docket Nos. 79-1, 79-2, 79-6, 79-7, 79-26.)  Only Plaintiffs' own letters and testimony suggest that they did not receive an opportunity to retake the courses.[8]  Moreover, even if the jury believed that Plaintiffs did not retake the classes, the Academy Chancellor made the decision to separate Plaintiffs from the Academy, not Cintrón-Suárez.  (Docket No. 79-6.)  The Academy had the authority to remove cadets if they failed to complete a course the first time.  (See Docket No. 79-13 at 5.)  The Academy Chancellor exercised that authority, removing Plaintiffs from the Academy on March 11, 2013.  (Docket No. 79-6.)

As night befalls day, Cintrón-Suárez's May 6, 2016 termination letters followed Plaintiffs removal from the Academy.  Plaintiffs provide no evidence linking Cintrón-Suárez's alleged discriminatory animus to the Academy's assessment of Plaintiffs' progress as cadets.  Without this causal link, Plaintiffs' argument rests on the type "unsupported speculation" for which summary judgment must be granted.  See, e.g., Forestier Fradera, 440 F.3d at 21.

Secondarily, Plaintiffs argue that Cintrón-Suárez passed over Plaintiffs for appointments to the auxiliary police.  Plaintiffs believe this shows Cintrón-Suárez's discriminatory animus, thereby undermining the Mt. Healthy defense.  As mentioned above, the fact that Plaintiffs were not appointed to the auxiliary police is not an adverse employment action because Plaintiffs set forth no evidence to show they ever applied for the job.  But even if they had applied, Plaintiffs' non-appointment as auxiliary police does not show discriminatory animus for two reasons: (1) Plaintiffs were encouraged to apply by Colón-Díaz, a PDP-member and Cintrón-Suárez appointee; and (2) only one of the two individuals appointed to the auxiliary police was a known-PDP member.  These

---

[8] For example, Plaintiffs explain away the failures and withdrawals on their transcripts by reasoning they were registered to retake the classes, but those classes were never conducted.

**Civil No. 14-1354 (GAG)**

facts cut against the notion that political party affiliation was part of the criteria for auxiliary police hiring. Thus, Plaintiffs' auxiliary police argument falls flat.

Summary judgment is appropriate in political discrimination cases where the defendants' Mt. Healthy defense shows that plaintiff was essentially unqualified for her position. See Velez-Rivera, 437 F.3d at 153-54 (affirming district court grant of summary judgment where plaintiff would have been terminated, regardless of political affiliation, because she was unqualified for her position). Defendants would have terminated Plaintiffs from their positions as probationary police cadets— regardless of political affiliation—because they failed to satisfy a prerequisite for the position: completion of the Academy. Therefore, Plaintiffs have failed to establish the reasonable inference that political discrimination was a substantial or motivating factor for their termination. Defendants' motion for summary judgment as to Plaintiff's political discrimination claim is hereby **GRANTED**.

B. Fourteenth Amendment Claims

Plaintiffs allege deprivation of their property interests without due process in violation of their Fourteenth Amendment rights by Defendants Cintrón-Suárez, Colón-Díaz, and the Municipality. (Docket No. 1, at 14-15.) The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. To survive summary judgment on this claim, Plaintiffs must demonstrate sufficient facts to create a reasonable inference that Plaintiffs (1) possessed a constitutionally protected property interest and (2) were deprived of that property interest without due process of law. See García-González v. Puig-Morales, 761 F.3d 81, 88 (1st Cir. 2014). This dispute centers on the first element: Plaintiffs' constitutionally protected property interest.

The Constitution's due process protections apply to public employees who possess a property interest in continued employment. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985);

17

**Civil No. 14-1354 (GAG)**

Casiano-Montanez v. State Ins. Fund Corp., 707 F.3d 124, 129 (1st Cir. 2013). Conversely, if a plaintiff cannot establish a protected property interest in their public employment position, then any due process claim must necessarily fail. García-González, 761 F.3d at 88. Here, the critical issue is whether Plaintiffs had a constitutionally protected property interest in their positions as police cadets. See Clukey v. Town of Camden, 717 F.3d 52, 55 (1st Cir. 2013) (citation omitted).

To establish a constitutionally protected property interest, Plaintiffs must identify a "legitimate claim of entitlement" to the right. Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 8 (1st Cir. 2005). A legitimate expectation of continued employment may derive from statute, contract, or official workplace policy. Santana v. Calderón, 342 F.3d 18, 24 (1st Cir. 2003). However, Plaintiffs must show more than an "abstract need or desire" or a "unilateral expectation" of a property interest. Id. (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)).

The Constitution does not create property interests itself. Roth, 408 U.S. at 569. Instead, a claim of entitlement derives from "existing rules or understandings that stem from an independent source such as state law." Id. at 577. Determining whether Plaintiffs possessed a property interest in their employment requires looking to local law. See Rojas-Velazquez, 676 F.3d at 212.

Puerto Rico law distinguishes "temporary" or "transitory" public employees, on the one hand, from "permanent" or "career" public employees, on the other hand. P.R. LAWS ANN. tit. 21, § 4554; see also Vázquez-Valentín v. Santiago-Díaz, 385 F.3d 23, 27 n.4 (1st Cir. 2004) *vacated on other grounds*, 546 U.S. 1163 (2006). Career employees hold a property interest in their continued employment, whereas temporary or transitory employees are essentially 'at will' employees. González-De-Blasini v. Family Dep't, 377 F.3d 81, 86 (1st Cir. 2004) (citations omitted).

Career employees are further subdivided as "regular career employees" and "probationary career employees." P.R. LAWS ANN. tit. 21, § 4554(b). This distinction matters. Regular career

18

**Civil No. 14-1354 (GAG)**

employees, as a function of their vested property interest in continued employment, "may only be removed from their positions for just cause and upon filing of charges." Id. Probationary career employees, on the other hand, are only entitled to permanent status "[o]nce their probation period has been approved" in a satisfactory manner. Id.; see also § 4558(c) ("Upon satisfactory completion of the probationary period, the employee shall become a regular employee in the position."). Thus, sections 4554(b) and 4558(c) establish that a probationary career employee only achieves regular career employee status after satisfying the probation period. See also Febus-Cruz v. Sauri-Santiago, 652 F. Supp. 2d 140, 151 (D.P.R. 2009) (discussing the probationary period for career employees under a related section of the civil code applicable to Commonwealth level government employees).

Puerto Rico law is pellucid that Plaintiffs did not possess a property interest in their probationary positions as police cadets. Plaintiffs each signed a contract with the Municipality to become Municipal Police Cadets. (Docket Nos. 79-4, 79-24.) Each contract denotes that the appointment type is probationary. Each contract includes a "Transitory or temporary expiration date" of December 31, 2012. To become a member of the Municipal Police—that is, a career employee—cadets must have "passed a course designed in coordination between the [PRPD] and administered by the [Academy]." (Docket Nos. 84 ¶ 88; 93-1 ¶ 88.) Plaintiffs were well aware of this requirement. (Docket Nos. 71 ¶¶ 58, 85; 84 ¶ 92.) Since Plaintiffs did not complete the Academy, they did not satisfy the probationary period. As a result, Plaintiffs did not possess a property interest in their continued employment as police cadets. See Febus-Cruz, 652 F. Supp. 2d at 151 (holding that plaintiff who did not satisfy the probationary period before termination did not state a claim for violation of a property right); see also Ramos v. Dep't of Educ., 52 F. Supp. 3d 387, 435-36 (D.P.R. 2014) (similarly holding and discussing Puerto Rico law's "focus on evaluation and satisfactory completion of the probationary period" in career positions for public employees).

**Civil No. 14-1354 (GAG)**

1
2
3
4
5
6
7
8
9

     As a fallback, Plaintiffs argue that even if they lacked a property interest in their appointments as cadets, they possessed a property interest in the conditions required to become career employees of the Municipal Police.  (Docket No. 83, at 24-27.)  The First Circuit recently rejected a logically similar argument.  García-González, 761 F.3d at 87-92.  In García-González, an independent contractor plaintiff—while conceding that an ordinary government contract did not create a constitutionally protected property right—attempted to assert a property right arising from the negotiations and documents that predated contract formation.  Id. at 88.  The First Circuit rejected this argument and affirmed the district court's grant of summary judgment on the due process claim.  Id. at 91-92.

10
11
12
13
14

     The logic and results are the same here.  Plaintiffs must concede their probationary cadet contracts did not create a constitutionally protected property right.  See Febus-Cruz, 652 F. Supp. 2d at 151.  Nevertheless, Plaintiffs assert a property interest in the conditions required to satisfy the probationary period.  (Docket No. 83, at 24-27.)  Thus, Plaintiffs' argument fails as a matter of logic and precedent.

15
16
17
18
19
20
21
22
23

     Moreover, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."  García-González, 761 F.3d at 90 (quoting Clukey, 717 F.3d at 56) (citations omitted).  Puerto Rico law provides that once a final evaluation of a probationary employee is received, "the nominating authority shall determine whether that employee shall continue as a regular career employee or shall be removed for failing to approve the probation period."  P.R. LAWS ANN. tit. 21, § 4554(b).  Here, the nominating authority (Cintrón-Suárez) retained the discretion to evaluate Plaintiffs.  For example, if Plaintiffs had passed the Academy, but some other (non-discriminatory) factor stood in the way of their career appointment, Cintrón-Suárez would have had the discretion to remove Plaintiffs from their positions.

24

**Civil No. 14-1354 (GAG)**

1    Plaintiffs appear to argue they acquired the property interest in their employment as
2  municipal police officers because they remained enrolled at the Academy after their cadet contract
3  expired on December 31, 2012.  (Docket No. 83, 25-27.)  In some instances, employees may have a
4  property interest in the renewal of term contracts.  <u>See, e.g.</u>, <u>Perry v. Sindermann</u>, 408 U.S. 593,
5  594-94 (1972).  However, these were not recurring term contracts; they were one-time probationary
6  career appointments.  Plaintiffs' subjective expectation of continued employment (and repeated
7  opportunities in the Academy) is not enough, the policies and practices of the institution must give
8  rise to a legitimate claim of entitlement.  <u>Id.</u> at 603.  Here, Plaintiffs have established no policy or
9  practice to show a constitutionally protected property right.

10    Plaintiffs' probationary appointments as police cadets did not establish a constitutionally
11  protected property right.  In that way, Plaintiffs' cadet positions are similar to a contract bid: in both
12  circumstances, additional requirements must be satisfied before the property right vests.  <u>See</u> <u>García-</u>
13  <u>González</u>, 761 F.3d at 89 (affirming partial summary judgment grant where preliminary approval of
14  a bid without a final contract did not create the legitimate expectancy in a property interest); <u>see also</u>
15  <u>Febus-Cruz</u>, 652 F. Supp. 2d at 151 (finding no property right in probationary appointment).

16    Since Plaintiffs have not established facts sufficient to support the reasonable inference that
17  they held a constitutionally protected property interest, that ends the due process inquiry.[9]
18  Accordingly, Plaintiffs' due process claim fails.  Defendants' motion for summary judgment as to
19  Plaintiffs' due process claim is **GRANTED**.

---

[9] Without a constitutionally protected property interest, the Court need not address the second due process prong, nor Plaintiffs' personal capacity claims.  Additionally, since Plaintiffs' federal claims cannot survive summary judgment, the Court declines to address Defendants' qualified immunity argument.

21

Civil No. 14-1354 (GAG)

C. <u>Puerto Rico State Law Claims</u>

Plaintiffs make passing reference to Puerto Rico state law in their complaint.  Plaintiffs claim violations of Sections 1, 2, 4, 6, and 7 of Article II of the Puerto Rico Constitution.  Additionally, Plaintiffs allege violations of Law No. 184 of August 3, 2004, as amended, P.R. LAWS ANN. tit. 3, § 1461, *et seq.*; Law No. 131 of May 13, 1943, P.R. LAWS ANN. tit. 1, § 13, *et seq.*; Law 100 of June 30, 1959, P.R. LAWS ANN. tit. 29, § 146, *et seq.*; and Articles 1802 and 1803 of the Civil Code, P.R. LAWS ANN. tit. 31, §§ 5141-5142.  (Docket No. 1, at 15-16.)  However, Plaintiffs have not discussed the elements of any cause of action arising under Puerto Rico law, much less demonstrated their entitlement to relief under Puerto Rico law.

The Constitution of Puerto Rico affords the same due process rights as the United States Constitution.  P.R. CONST. Art. II, § 7 ("No person shall be deprived of his liberty or property without due process of law"); <u>see</u> <u>Nazario v. Dep't of Health of Commonwealth of P.R.</u>, 415 F. Supp. 2d 48, 49 n.2 (D.P.R. 2006) ("insofar as Due Process is concerned, both state and federal constitutions afford an individual the same protections against actions by the State.").  Therefore, for the reasons set forth above, Plaintiffs' claims arising under Section 7, Article II of the Constitution of Puerto Rico are **DISMISSED with prejudice**.

Plaintiffs' complaint also references claims under Sections 1, 2, 4, and 6 of Article II of the Constitution of Puerto Rico.  However, Plaintiffs have made no effort to show any entitlement to relief on these claims.  "A party may not simply throw a statutory reference into a complaint hoping to later flesh out its claim with facts in support."  <u>Ruiz Rivera v. Pfizer Pharm., LLC</u>, 521 F.3d 76, 88 (1st Cir. 2008).  Given the opportunity, Plaintiffs did not flesh out the law or the facts to support these claims.  Therefore, Plaintiffs' claims arising under Sections 1, 2, 4, and 6 of Article II of the Constitution of Puerto Rico are **DISMISSED with prejudice**.

Civil No. 14-1354 (GAG)

"Law 100 prevents private enterprises or government agencies acting as a private business from discriminating by reason of age, race, color, religion, gender or national origin or social condition." Ortiz-Rodriguez v. Consorcio Del Noroeste, No. 14-1529 (GAG), 2016 WL 1255694, at *12 (D.P.R. March 29, 2016) (citation omitted). However, Law 100 does not apply to state actors. See id.; Marquez-Ramos v. Puerto Rico, No. 11-1547 (SEC), 2012 WL 1414302, at *10 (D.P.R. April 2, 2012). Defendants here are clearly state actors, so Law 100 does not apply. Therefore, Plaintiffs Law 100 claims are **DISMISSED with prejudice**.

Plaintiffs' complaint may raise other supplemental law claims, which Plaintiffs have utterly failed to expound. The Court is not a mind reader, and as such, has no obligation to do what Plaintiffs have had ample opportunities to do and not done. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.") (internal citations and quotations omitted). As such, all remaining supplemental law claims, as well as any other possible supplemental claims that were not adequately alleged and supported with evidence in the record, are hereby **DISMISSED with prejudice**.

**IV.  Conclusion**

For the reasons stated above, the Court **GRANTS** Defendants' motion for summary judgment at Docket No. 69. Plaintiffs First and Fourteenth Amendment claims are **DISMISSED with prejudice**. Additionally, Plaintiffs' supplemental state law claims are **DISMISSED with prejudice**. Judgment shall be entered accordingly.

**SO ORDERED.**

In San Juan, Puerto Rico, on this 8th day of February, 2017.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge